SMITH (MARTIN v.). See Case No. 9,164.

SMITH (MATCALM v.). See Case No. 9.272.

SMITH (MATTINGLY v.). See Case No. 9,-293.

SMITH (MAYO v.). See Case No. 9,355.

## Case No. 13,078.

SMITH et al. v. MERCER et al.

[5 Pa. Law J. 529; 4 West. Law J. 49; 3 Pa. Law J. Rep. 444.]

Circuit Court, E. D. Pennsylvania. 1846.

PATENTS—REISSUE TO ADMINISTRATOR—EFFECT ON GRANTEES OF TERRITORIAL RIGHTS — FOREIGN ADMINISTRATORS — STATE LAWS — PLANING MACHINES.

[1. The administrator of a deceased patentee is the only one who, under the act of 1836, has a right to surrender the patent for the purpose of receiving an amended patent, and his right to do so is not affected by the fact that he had previously made grants of exclusive rights, under the patent, for certain parts of the United States.]

[2. The amendments in a reissued patent inure to the benefit of grantees of exclusive rights, under the original patent, for particular localities.]

[3. A patent signed by the secretary of state, and countersigned under the seal of the patent office, by the chief clerk of that office as "acting commissioner," during the absence of the commissioner, must be recognized as valid, irrespective of the question whether the chief clerk has authority to act as commissioner of patents during the mere absence of the commissioner, and while he yet retains his official character.]

[Cited in Woodworth v. Hall, Case No. 18,-017.]

[4. A grantee of a patent right may sue upon the patent in the Pennsylvania courts, notwithstanding that he derived his right from a foreign administrator, although such administrator has never taken out letters of administration in Pennsylvania, for the local laws have no application in respect to patent suits.]

[Cited in Goodyear v. Hullihen, Case No. 5,-573.]

[5. The Woodworth reissue patent of 1842, for an improvement in the method of planing, tongueing, grooving, and cutting into moldings, planks, boards, etc., is not invalid as covering a different invention from that of the original. Woodworth v. Stone, Case No. 18,021, followed.]

[6. The original Woodworth patent of 1828 held valid, and declared to be so well supported by judicial decisions as to give a right to a preliminary injunction against an infringer.]

7. The Woodworth patents analyzed and construed, and held infringed.]

In equity.

G. W. Biddle and W. W. Meredith. for complainants.

C. Gillon and H. J. Williams, for respondents.

KANE, District Judge. This case came before the court on bill and affidavits, upon a motion to restrain the defendants, by special injunction, from constructing, selling, and using Woodworth's planing, tongueing and grooving machine, or any of the parts or combinations thereof. It was fully examined and ably argued by the gentlemen who are of counsel in the several cases growing out of Mr. Woodworth's patent-right; and it was agreed. that the evidence adduced in the case of Sloat and Plympton, which was considered immediately after this, should be applied to both cases.

The facts, so far as they are undisputed, are these: On the 27th December, 1828, letters-patent were issued to William Woodworth, of Troy, in the state of New York, conferring on him exclusive property of his "improvement in the method of planing, tongueing, grooving, and cutting into mouldings, or either, plank, boards or other material." The patentee having died on the 9th of February, 1839, letters of administration on his estate were duly granted to his son, William W. Woodworth, by the surrogate of New York, at which place the father was residing at the time of his death. On the 29th July, 1842, the administrator applied for an extension of the patent for seven years; and the board of commissioners, to whom the application was referred, under the act of 1836 [5 Stat. 117], having certified in his favor, the patent was extended in the name of the administrator as such. On the 8th July following, the administrator surrendered his letters-patent, in accordance with the provisions of the 13th section of the act of 1836, for the purpose of obtaining a renewal upon an "amended specification, describing the invention in more full, clear, and exact terms"; and the amended patent was issued to him on the same day, under the hand of the secretary of state, countersigned and sealed with the seal of the patent-office, by "Henry H. Sylvester, Acting Commissioner of Patents." The complainants are acting under a grant of the exclusive right within and throughout the county of Philadelphia, made by the administrator, on the 29th November, 1842, and duly recorded. It is admitted that the defendants, Plympton and Hogeland, have been using, and they claim the right to use again, a machine known as Ira Gray's, which effects the same purposes as Woodworth's, and which is alleged by the complainants to be in principle and substantially the same.

Upon these facts, several preliminary questions have been discussed by the counsel for the parties, which I shall briefly consider.

1. It is said that the administrator had no power to surrender the patent of 1828. after assigning exclusive right under it, and that the new letters-patent, being founded on such

surrender, are void. It is not easy to see how this objection, if valid, could affect the case before the court. The complainants do not claim under the new letters-patent but under the old; and these cannot have been invalidated by an unlawful surrender of them. But it seems to me a mistake to regard the complainants, or any other persons whose rights have been brought to the notice of the court, as the assignees within the meaning of the patent laws. There are four classes of persons recognized by the 13th and 14th sections of the act of 1836 as parties "interested." These are the original patentees, their executors, or administrators, their assignees, and the grantees under them of the exclusive right for a specified part of the United States. These last, by the express words of the 14th section, have the same rights of suit as the patentee or his assignees; and it is by force of this, that the complainants, who are merely grantees of a limited right, are admitted as parties here. But they have no power over the letters-patent; these remain with the party to whom they were issued, or the general representative of his interest; and the power of surrendering them for amendment and renewal is vested exclusively by the 13th section in "the patentee, his executors and administrators, or the assignee of the original patent." The administrator, therefore, upon the facts disclosed, was the only person who could make the surrender and receive the amended patent; and there is nothing in the act of congress which restricts his right to do so, because of his having previously made special or limited grants or licences.

2. It is said that the amendments of the specification, as made upon the re-issue of the patent in 1843, do not enure to the benefit of the assignees or grantees under the patent, as it stood before; in other words, that they must stand or fall with the original specification. I cannot assent to this. The complainants are not grantees of the patent, or any part of it; they are grantees of certain rights, of which the letters-patent are the evidence and definition. If those rights are made more clear and definite, not more extensive, by any new or additional act whatever, from whomsoever proceeding, why shall the complainants be denied the advantage of using that clearer and less equivocal evidence? This is not the case of a surrender and re-issue with amended specification, where the grantee for a district prefers resting his claims on the specification as it stood when he purchased his right; as when the patentee makes a disclaimer of part of the invention, the prior grantee might in such case refuse to be affected by it. But here the objection comes from third persons. The complainants adopt the amended specification, by making it a part of their bill; and the only inquiry is, as to their authority for doing so. The question is settled as to third parties by provision of the act, that the amended specification shall have the same effect and operation in law, on the trial of actions, as though it had been originally filed in its corrected form.

3. The 5th section of the act of 1836 directs that all patents shall be issued under the seal of the patent office, and be signed by the secretary of state, and counter-signed by the commissioner. It is argued that this patent is invalid, because signed by an acting commissioner. Mr. Sylvester, the countersigning officer, was the chief clerk of the patent office at the time,—and as such, by the words of the 2d section of the act, in all cases, during the necessary absence of the commissioner, or when the principal office became vacant, had the charge and the custody of the seal, record, and other things belonging to the office, and was required to "perform the duties of commissioner during such vacancy." It is contended by the complainants, that the words "during such vacancy" apply as well to the case of the necessary absence of the commissioner as to that of the commissionership being vacant by death, resignation, or removal. This may be a grave question. I am not prepared to say, that the absence of the commissioner, while he retains his official character, constitutes a vacancy in the office; or that the inferior officer can succeed to or exercise the powers of the principal station, while that station has a lawful incumbent. But I do not regard the question as properly before me, at the present stage of the cause. I recognise the signature of the secretary of state, the public seal of the patent office, and the counter-signature of a person who has the custody of it during the absence of the principal commissioner, and the right to use and attest it in a certain contingency. I find him designating his official character for the time, by words that imply his legal substitution to the duty in question. There is no allegation of fraud or usurpation on his part. On the contrary, his act is sanctioned by the commissioner now acting in person.

It would be too much for me, in an interlocutory proceeding like this, to deny the validity of these letters-patent. I am inclined rather to adopt for the time the language of Judge Story, in the case of Woodworth v. Stone [Case No. 18,021] 1st Cir., May term, 1845, on a question not unlike the present, and take the countersignature, as he did the re-issue of the patent, "to be a lawful exercise of the officer's authority, unless it is apparent on the very face of the patent that he has exceeded his authority."

4. It is contended, that a grantee of a right under letters-patent cannot maintain a suit in a circuit which forms part of Pennsylvania, if he derives his title through

a foreign administrator. This idea refers itself to the local laws of Pennsylvania, which, as it seems to me, have no application to the case. By the act of 1836, "all actions, suits, controversies, and cases" whatever, arising under the patent laws, are without any exception originally cognisable in the courts of the United States; and it has been held in the case in which the question has arisen (Parsons v. Barnard, 7 Johns 144) that this jurisdiction is exclusive. The right, which is vested by letters-patent, has its origin in the patent-laws, and is transferable and transmissible according to their provisions. On the death of the patentee in this case, it passed under them to his administrator; and, as it was a personal right, the administrator constituted by the forum of the domicil, became liable to account for it. If the right has been since violated, he may sue for damages in his own name, as for a wrong to his possession. If he has sold it in whole or in part, he may recover the price in his own name, as for a breach of contract with himself. Grier v. Huston, 8 Serg. & R. 402; Wolfersberger v. Bucher, 10 Serg. & R. 13.

I cannot doubt, therefore, that William W. Woodworth, the administrator, to whom the letters-patent passed upon the death of the patentee, might himself have maintained an action in the circuit court for a breach of the patent right, without taking out new letters of administration in Pennsylvania. Still less can I doubt the power of this court to interpose by injunction in such a case, to prevent an intended violation of right. It would be almost equivalent to a judicial repeal of the letters-patent upon the death of the patentee, to affirm that the restraining actions of the courts shall have no operations beyond those of the twenty-eight or thirty states in which the patentee is represented by a local administrator. But were the law in this particular otherwise than I believe it to be, it is by no means true, that the incapacity of a foreign administrator to sue implies the same consequence to his alienee. On the contrary, it has been expressly declared by the highest of our courts, that where a plaintiff's title is derived through a foreign administration, it may be asserted in a judicial proceeding here, without constituting a domestic administrator. Trecothick v. Austin [Case No. 14,164]; Harper v. Butler, 2 Pet. [27 U. S.] 239.

5. A good deal of evidence was adduced to show that the amended specification describes a different improvement from that which is embraced in the original patent; and it was argued, that the amended patent was invalidated by the variance. This, however, on the authority of Judge Story, in a case affecting this very patent (Woodworth v. Stone, ut supra), I do not regard as open to question at this time. "It appears to me," he said, "that prima facie, and

at all events in this stage of the cause, it must be taken to be true that the new patent is for the same invention as the old patent; and that the only difference is not in the invention itself, but in the specification of it." For the purpose of the injunction, if for nothing else, I must take the invention to be the same in both patents, after the commissioner of patents has so decided by granting a new patent.

Though thus relieved from the necessity of passing upon the question, I feel bound to remark that the evidence has not satisfied me of the fact it was intended to establish. The very title of the patent, in the words of the inventor, "is improvement in the method of planing, tongueing, and grooving, or either," and the expression in the body of the specification, that after the planing is completed, the tongueing and grooving apparatus is to be used "if required," indicate to me that the patentee had in his mind from the first a machine of several parts or systems, which could be used separately or in combination, as his administrator has developed more fully in the amended specification. So, too, his omission to declare in the first specification, that he employs rollers for retaining the board in its place while planing, though fully set out in his amended specification, cannot, in my view, support the idea that the inventions described are not essentially the same. The rollers which he refers to in the first specification, and which are more unequivocally shown in the drawing annexed to it, as giving motion to the board, would almost necessarily perform the double office, besides which there are other devices well known to mechanics, which could be conveniently adapted to the object. I see nothing in the two specifications which could justify me in referring them to different machines.

These preliminary objections being disposed of, three questions present themselves: (1) Was William Woodworth the inventor of the machine, for which he obtained letters-patent in December, 1828? (2) Has he had, since the issuing of the letters-patent, such an exclusive and continued possession under them, or have his rights as patentee been so vindicated by judicial action, as to claim for him the summary intervention of equity at this time for his protection and repose? (3) Is the machine now made or used by the defendants the same in principle and substance with the machine so patented, or with any material and distinguishable part of it?

The two first of these questions have been so often decided in the circuit courts of the United States as to dispense with the consideration of them at this time: In the case of Van Hook v. Scudder [Case No. 16,853], in the circuit court for the Southern district of New York, in 1843; and in another case in the Northern district of the same state; in that of Wilson v. Curtius [Id. 17,800], in

the Fifth circuit, Louisiana district; in Washburn v. Gould [Id. 17,214], in the First circuit before Judge Story, at May term, 1844; and in twenty other cases decided summarily, immediately afterwards by the same judge; and again in Woodworth v. Stone [supra], at May term, 1845. In all of these, and in numerous other cases which have been alluded to in the arguments, the Woodworth patent has been recognised as valid, and the claimant under it as entitled to protection by injunction. Two cases only have been mentioned as implying a different opinion. The first is that of Woodworth v. Wilson [Id. 18,023], in the circuit court for Kentucky, where an injunction which had been granted was dissolved after more full hearing. But in this case the decree dissolving the injunction was reversed by the supreme court at its last session, and a perpetual injunction directed. The other case is that of Richards v. Swimley [Id. 11,773], on the equity side of this court (No. 1, of April sessions, 1841), in which Judge Hopkinson is supposed to have refused an injunction to claimants under the Woodworth patent, against a person who used a machine closely resembling that of these defendants. But an inspection of the record shows the supposition to be mistaken. The bill in that case was filed on the 4th November, 1840; and notice was given of a motion for an injunction, to be made on the 14th. On that day the complainants filed two affidavits, which defined the infraction to consist in the use of Woodworth's tongueing and grooving apparatus, making no mention of the machinery for planing. It does not appear that the motion was ever heard; and on the 16th, two days after the time noticed for making it, it was withdrawn by the complainants; since which no proceedings have been had in the cause. The right of the complainants in the machine expired in 1842. No judicial opinion on the part of Judge Hopkinson can be inferred from these facts; and I am left therefore to the concurrent judgments that have been pronounced in other circuits. I may add that my own very careful examination of the different inventions that are supposed to interfere with Woodworth's has not led me to a different conclusion from that which a proper judicial comity invites me to adopt.

6. The only remaining question is that which regards the substantial identity of the machine used by the defendants with that patented by Woodworth. The patent of Woodworth, as defined in his amended specication, is for a machine, capable of performing the operations of planing, tongueing, and grooving, at one and the same time, but which admits of their being performed separately. It consists essentially of two parts or systems,—one for planing or smoothing the surface; the other for fashioning the tongue and groove upon the edges. The apparatus for feeding the machine, and the rollers by which the elastic material is held firm while undergoing its action, are subsidiary to these. I shall consider the two systems of machinery in succession.

(1) The planing machine: A practically smooth surface may be given to plank or other substances, by the application of either of three forms of tool: The chisel, which, with a gauge to regulate its action, becomes the ordinary plane; the drawing-knife, which with a similar gauge, forms the spokes-shaver; and the adz. Each of these has its appropriate or characteristic motion, though by the ingenuity of the workman, the motion of either of them can be modified so as to approach that of another. The chisel, when in the form of a plane, has its blade fixed at an acute angle with the surface to be reduced, and works parallel to that surface, the edge cutting generally at right angles. The gauged drawing-knife differs from the plane in this: That, by means of its two handles, its edge may be made to cut obliquely or at right angles, at the pleasure of the workman. Its general motion is parallel to the surface; though, being more under the control of the hand, and having its blade sometimes slightly arched, it may be made to deviate upwards or downwards, with a varying angle, or in a curve.

The adz has an arched edge, and cuts only in curves; the level surface being attained proximately by a succession of such cuts. The plane and drawing-knife operate by shaving the surface, the adz by chipping. The chisel-plane was combined with apparatus for giving it motion and direction, in the machines of Bentham in 1791, Bramah in 1802, and Muir of Glasgow in 1837. In the first and last of these, the character and direction of the motion were those of the same tool when worked by hand. In Bramah's the planing-blades or irons were fixed upon a revolving disc; the character of the motion thus becoming circular, but still continuing to be parallel with the surface. The planing machine of Woodworth, though it uses knives or cutters resembling plane-irons in form, is essentially a series of adzes. These are attached to the outside of the cylinder, in lines either parallel or oblique to its axis; and, as the cylinder revolves, they cut with an adz-like or revolving motion; the knife which is parallel to the axis presenting its whole edge to the plank at the same moment, and in this respect cutting like the plane; the knife which is oblique or in the helix form presenting the parts of the edge in succession, and in this respect cutting like the drawing-knife; but both forms of knife cutting in vertical curves, like the adz, not in plane surfaces like the chisel-plane, and its combinations by Bentham, Bramah, and Muir. Regarding the Woodworth machine as substantially different from the three last mentioned, I find the substantial difference to consist in this: That they act in planes parallel to the surface to be removed, Woodworth's in vertical curves;

that theirs produce an absolutely level surface; his a surface apparently level, but in fact corrugated or grooved.

(2) The tongueing and grooving machine: The idea of tongueing and grooving by modifications of the circular saw is at least as old as 1793. when it was described by General Bentham. from whom Muir copied his machine many years after. The specifications of the two concur in describing a thick revolving saw or cutter to make the groove, and two wheel saws set at right angles with each other on each side the plank. making four in all. to cut the rebates of the tongue. The machine of Woodworth is an improvement on these, by substituting a single firm cutting wheel for the four circular tongueing saws, and combining this with the equally firm grooving cutter on the other edge of the plank, to reduce it to an exactly equal width throughout. I do not see an essential difference between the grooving cutter in this machine and the circular saw or cutter described by Bentham and Muir. But their tongueing apparatus is cleary not the same as Woodworth's; and I doubt very much whether the tongueing and grooving could be practically combined in their machines. with the same effect as they are in his: they certainly are not. These two systems of machinery. the planing, and the tongueing and grooving. seem to me to constitute the essential and only essential parts of the Woodworth improvement. The amended specification claims them, in the several combinations of which they are susceptible, as follows: (1) The employment of the rotating planes, in combination with the subsidiary rollers. or any analogous device; (2) the combination of those planes with the tongueing and grooving wheels; (3) the combination of the tongueing with the grooving apparatus; (4) the combination of either the tongueing or grooving wheels with the rollers. which by their pressure hold the plank steadily in its place.

Having thus analyzed the patent right under which the complainants claim. it remains to determine whether the machine used by the defendants is in part or in whole substantially the same: and (1) of the planing machine, it is apparent that so soon as a planing machine having a general resemblance to the revolving disc of Bramah ceases to operate in an absolutely plane surface. it loses one of the characteristics of his machine. On the other hand. it is clear that a machine like Woodworth's may not exactly conform in its structure to the rigid definition of a cylinder. The smallest change of diameter between the two ends of the revolver, on which the planing knives are placed. would convert the cylinder into the frustrum of a cone; and a corresponding inclination of the axis of motion. or a corresponding adjustment of the plank to be acted on, would make the machine operate as well, or nearly as well. as if the exact character of the cylinder had been retained. Yet, just in proportion as the sides

of the Woodworth revolver approximate to a cone, the machine approaches the planing disc of Bramah. It ceases to cut as the adz merely, but takes in some degree the characteristic action of the chisel-plane or the drawing-knife.

So, too, when you give a disked form to the disc of Bramah. thus converting the disc into a cone, you lose in part the characteristic action of the chisel-plane and drawing-knife. and introduce in the same degree the appropriate motion of the adz. This deviation from the strict form of the Woodworth machine towards that of the Bramah, or from the Bramah towards the Woodworth, may go on increasing till the appropriate action of the original machine effectively disappears; the cylinder. by a series of progressive changes. having lost itself in the disc, or the disc in the cylinder. It is impossible to define, for the practical objects of a judicial decree, that angle or degree of deviation at which one of these geometric forms shall be said to pass into the other. Between the two machines, then. the Bramah, unprotected by a patent in this country. which cuts parallel to the surface with a planing motion. and the Woodworth, which cuts with the dubbing action of the adz, where is the line of separation? Obviously, it is at the point of the first deviation from the free machine to that of which the use is prohibited.

Turning now to the machine used by the defendants, we find it to be a revolving cone, its axis or spindle so arranged that the tangent plane of its curve shall coincide with the surface to be made smooth. It partakes of the disc character, and cuts as the drawing-knife and chisel-plane also; but just so far as it varies from the simple disc of Bramah, it embraces the principle of Woodworth's machine. by involving the dubbing action of the adz. It cuts as the drawing-knife and the plane, while approaching the point at which the knives act upon the finished surface; and its cutters continue to revolve with a similar motion after passing that point; but at the effective moment it is not the plane or the drawing-knife, but the adz cut. that finishes the work.

Much stress has been laid upon the fact that the knives in the defendants' machine are not in the lines of the radius, but have a certain obliquity. which, brings one part of the edge in contact with the board before the rest. and gives a sloping or drawing action. not unlike that of the pocket-knife while cutting a stick. But I see nothing in this action or arrangement to distinguish it in principle or substance from that of the Woodworth rotary cutter. when placed in the oblique line of the helix. Whether it be be the knife, that moves in part lengthwise during its revolutions. presenting the points of its edge to the board in succession, or the board. which. moving onwards. presents its face to the several points in succession of the knife edge, or whether the action results

from the combined motion of the two; the machine and its mode of operation are substantially the same. I am, therefore, of opinion, that the planing machine of the defendants is an infringement of the complainants' patent right.

(3) As to the tongueing and grooving machine: This part of the machine in use by the defendants does not vary sensibly in form or character from the tongueing and grooving apparatus claimed by Woodworth. Until his patent shall be invalidated, he has a right to claim of this court the protection of its restraining process in regard to this also.

It is my duty, therefore, to grant the full injunction as prayed for. In doing so, I am not insensible to that which was so ably pressed in argument, that, if I am in error, the respondents may be seriously prejudiced. But the court can seldom encounter a case that does not involve a similar responsibility for consequences. To withhold judicial action is not to escape from this. The right of a party to the most speedy and effectual protection against a meditated wrong, is as complete as his right to redress for wrongs already inflicted; and the accident of position confers no right on one party, whether he be plaintiff or defendant, at the expense of the other. The special injunction of equity, like the arrest on mesne process of the law, may be abused to the injury of an opponent; but it is no less on that account the duty of the judge to further them both, when, in the exercise of his best discretion, he believes that they are called for by the merits and the exigency.

This is the case of an ancient and highly important patent-right. It has been contested at law and in equity with an eagerness and pertinacity proportioned to its value. Yet, during the lifetime of the inventor,—eleven years,—it was "never successfully impeached." Story, J., in Washburn v. Gould [Case No. 17.214]. Since his death, numerous questions have been raised as to the title of his administrator under the renewal of the patent, which were only settled by the supreme court within the present year. It is under the decision of that tribunal, in the case of Wilson v. Rosseau [4 How. (45 U. S.) 646], that the claimants assert their right to come before this court as parties in interest. They have lost no time. The decision at Washington was made in March, and they filed their bill in April. The motion for an injunction, argued before my predecessor in office, and left undecided by his death, was brought to my notice on the day I first took my seat on the bench. There is here no acquiescence, no laches; but, on the contrary, all promptness and vigilance.

I accordingly direct a special injunction to issue according to the prayer of the bill, and to remain until the hearing of the cause, or the further order of this court.